Alden G. Thompson and Carole H. Thompson v. Commissioner.
Thompson v. Commissioner
Docket No. 5871-66.
United States Tax Court
T.C. Memo 1969-19; 1969 Tax Ct. Memo LEXIS 279; 28 T.C.M. (CCH) 75; T.C.M. (RIA) 69019; January 29, 1969, Filed Towner Leeper, 7th Fl., Southwest Nat'l Bank Bldg., El Paso, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency of $1,840.99 in petitioners' income tax for the taxable year 1964. Petitioners did not contest one of the adjustments made by respondent. We find that adjustment to be conceded. The issues left for decision are (1) whether petitioners are entitled to a deduction for depreciation and repair expenses with respect to certain audio recording equipment and (2) whether petitioners are entitled to an investment credit with respect to said equipment. Findings of Fact *280 Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Alden G. Thompson (hereinafter referred to as Alden) and Carole H. Thompson are husband and wife. [1] They filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue at Austin, Texas. They resided at Holloman Air Force Base in New Mexico (hereinafter referred to as Holloman) at the time the petition herein was filed. Alden has been an active career officer in the United States Air Force since graduating with a degree in engineering from West Point. At the time of the trial herein, January 1968, Alden was still on active duty. In about 1947 or 1948, the Air Force sent Alden to the Armed Forces Information School in Carlisle, Pennsylvania, a school for teaching military personnel public relations and radio broadcasting and programming. Alden was a good student and showed such an interest in the radio portion of the program that he was retained as an instructor after completing the course. *281 Alden's instructorship at the school at Carlisle further intensified his interest in radio. After his assignment as an instructor was completed, he was sent to Athens, Greece, as a pilot. His assignment in Greece had nothing to do with broadcasting. As a sideline, however, he and other interested officers started a radio station. During this period of time Alden was acquiring a collection of recording 76 equipment for himself. His activities in this regard were merely a hobby. Alden used his recording equipment to extract music from records onto tapes. Contrary to popular belief, the extraction of music from records onto tape is not a simple process. Sophisticated electronic equipment must be used to extract all the music that is on a particular record. Several records are utilized. They are mixed on a tape electronically and logged to produce continuous music for a specified time period. To make a tape that reproduces music for three hours, it usually took Alden eight hours of preparation. Alden keeps most of his master tapes. When he disposes of a tape, he generally only disposes of a copy made from a master tape. Alden terminated his duty in Greece early in 1960. At *282 this time he unsuccessfully tried to get an assignment with Armed Forces Radio. Instead, he was assigned to be the base commander of the United States Air Force Base in Bitburg, Germany. Bitburg is located near the Luxembourg border and has a population of about 8,000 people. This was Alden's first nonflying assignment. For the first time in his military career he had a reasonable amout of free time to devote to his recording equipment activities. In Europe at this time, pursuant to the Status of Armed Forces Agreement, United States military personnel were subject to a penalty for engaging in the black market by purchasing merchandise at a post exchange or other military installation outlet and selling the merchandise for a higher price off the base. The Status of Armed Forces Agreement also had very strict rules as to who could conduct a business in Europe. In 1960 Alden helped form the Bitburg Amateur Radio Club Audio Division (hereinafter referred to as BARCAD) which during the four years he was in Germany became a major retail outlet for hi-fi gear, professional recording equipment, and related items. Only military personnel and those civilians authorized to buy at post exchanges *283 were permitted to purchase from BARCAD. BARCAD, however, never sold any equipment to the post exchanges. Moreover, BARCAD was not allowed to compete with the post exchanges. As a charter member of BARCAD, Alden could buy equipment from BARCAD at its cost. Noncharter members paid cost plus 10 percent. Alden's principal reason for belonging to BARCAD was this discount. BARCAD had a system whereby "credits" could be earned by its members and used, in lieu of cash, to purchase equipment. These credits were received for working in BARCAD's shop. The credit system was developed because BARCAD was not authorized to pay cash to people who worked for it. Alden's duties as base commander in Bitburg did not leave him sufficient free time to obtain credits from BARCAD by working in its shop. Because he wished to earn credits, Alden transferred tapes he had made to BARCAD. BARCAD gave him credits for the tapes and placed them in its lending library. Alden acquired a number of items of recording equipment from or through BARCAD while he was stationed in Germany. He paid cash for some items, credits for some items, and a combination of cash and credits for other items. While Alden was stationed *284 in Germany, he made no cash sales of enhanced tapes. He did, however, trade enhanced tapes along with used recording equipment for new and better recording equipment. He was not in need of cash at this time and he wanted to upgrade his recording equipment. Almost all of Alden's trading activities in Germany were with BARCAD. Alden had no permanent place of business in Germany. He did have a "recording studio" in his military quarters. However, there was no sign on these quarters indicating that he was in business. Furthermore, Alden did not transact any business with German civilians. In May 1964 Alden was reassigned from Bitburg to the United States. He was stationed at Holloman where he and his wife have since lived in a house furnished by the Air Force. At all times since returning to the United States, Alden has been the Director of Personnel Management on the staff of the commander of Holloman. After leaving Germany in May 1964, Alden devoted the next two or three months to completing his family's move to Holloman. Upon reaching Holloman, he considered the possibility of establishing an FM stereo broadcasting station there with the expectation that he would sell tapes to *285 it. However, the station was never established because regulations prohibit such stations on Air Force bases. After completing his move to 77 Holloman, Alden spent all of his spare time for the remainder of 1964 converting his recording equipment from the 250 volt 50 cycle electric current used in Europe to the 110 volt 60 cycle current used in the United States. At the time he obtained this equipment in Europe, Alden knew that it would have to be converted to another current when he returned to the United States. At no time during 1964 did Alden hold himself out to the general public as being engaged in business. Since returning to the United States, Alden's recording equipment has been located in the house at Holloman furnished by the Air Force. He has not placed any signs on this house indicating that he is in business. Furthermore, he has never taken out a business license with any governmental body. As of the date of the trial herein, his tape and recording equipment activities have consisted of (1) a transaction in September 1964 with Boynton Studio of Scarsdale, New York, where he was upgrading his equipment by trading equipment for equipment and (2) a transaction in 1965 *286 with Scheaffer Electronics in California where he traded tapes for equipment. Alden has never had any employees. Nor has he ever done any advertising. Finally, he has never kept any ledgers or journals. After returning to the United States, Alden learned that his recording activities were possibly in violation of copyright laws. He contacted several recording companies as well as the American Society of Composers, Authors, and Publishers (hereinafter referred to as ASCAP) and Broadcast Music. Incorporated (hereinafter referred to as BMI), to determine whether he should pay fees or royalties to any of them. Alden received divergent answers as to whether his activities conflicted with their interests. RCA Victor advised him that he should be cautious and should obtain competent legal advice. Alden has never paid any fees or royalties to any recording company, ASCAP, or BMI. Nor has he ever cleared up the legal questions concerning copyright laws. He did contact one lawyer about the problem. The lawyer told him to continue his activities and not to ask questions. Alden apparently never pursued the matter further. Through the end of the taxable year 1964, Alden never reported any sales *287 of tapes or recording equipment on his income tax returns. Moreover, prior to the taxable year 1964 Alden never deducted any expenses or depreciation in connection with his tape and recording equipment activities. Alden prepared his own tax returns prior to the taxable year 1964. However, in connection with the preparation of his 1964 return, he became disturbed when he computed his tax liability. It appeared to be substantially in excess of his liability for prior years. He therefore decided to discuss the matter with an accountant prior to filing his return. The accountant contacted by Alden inquired as to whether, among other things, Alden had any outside business. Alden's initial reply was "no." However, upon further reflection, Alden asked whether his recording activities might amount to a business. Alden had a difficult time explaining the nature of his recording activities to the accountant. After some discussion, the accountant suggested that Alden should prepare a list of his recording equipment. Alden prepared the list of equipment and attached it to his 1964 return. When Alden finished the list, he "was a little flabbergasted to find out what [he] had in the way of *288 equipment." In the return filed by Alden for the taxable year 1964, he claimed a loss deduction of $3,396.26, made up of depreciation on recording equipment of $3,097.90 and repairs to recording equipment of $298.36. He also claimed an investment credit of $997.12 with respect to the recording equipment. In his statutory notice of deficiency for the taxable year 1964, respondent disallowed the loss deduction and investment credit claimed by Alden. Opinion The primary issue is whether, pursuant to any possibly pertinent provision of the Internal Revenue Code of 1954, [2] Alden is 78 entitled to deduct $3,396.26 of depreciation and repair expenses in 1964. An ancillary issue is whether Alden is entitled to an investment credit of $997.12 in 1964. [3]
*289 Both issues hinge upon the question whether in 1964 Alden conducted his recording equipment activities with a bona fide intention of making a profit. , affd. (C.A. 2, 1967), certiorari denied . A taxpayer's intention with respect to a given activity is a question of fact to be determined from the record in each case. (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied . The record in the present case is vague and confusing. There is no clear picture of the exact nature of Alden's recording activities. Nor is there a clear picture of how and when if ever these activities are going to result in a profit. In addition to being vague and confusing, the record is incomplete. There is no evidence of an organized, businesslike attempt by Alden to engage in an activity for profit. Alden did not introduce evidence of longrange planning or of organized recordkeeping. Nor did he introduce evidence to prove that he had regular customers and receipts - normal attributes *290 of a profit-making enterprise. Moreover, in many instances the evidence which appears in the record tends to indicate that Alden's activities were motivated by pleasure rather than by a desire to make a profit. At no time through the end of the taxable year in question did Alden hold himself out to the general public as being engaged in business. Indeed, Alden did not even carry on his recording activities during the year in question. He consumed his spare time during this year in moving to Holloman and in changing the electric current requirements of his equipment. Alden has not carried his burden of proving that he had the requisite intent to make a profit. During trial he admitted that, at least as late as 1960, his recording activities were merely a hobby. We think he has not shown that they were anything more through the close of 1964. Inasmuch as we have concluded that in 1964 Alden did not conduct his recording activities with a bona fide intention of making a profit, we hold that he is not entitled to a deduction in that year for depreciation and repair expenses. Because Alden is not entitled to a depreciation deduction in 1964, he is not entitled to an investment credit *291 in that year. Section 48(a)(1). Decision will be entered for the respondent. Footnotes
1. Carole H. Thompson is a party only by virtue of filing a joint return.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * * SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred ring the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income * * * ↩
3. A taxpayer is entitled to an investment credit only on property with respect to which depreciation is allowable. Sec. 48(a)(1).↩